Au, Adm'x, etc., *v.* New York, L. E. & W. R. Co.

*(Circuit Court, N. D. Ohio.* November 8, 1886.)

1. NEGLIGENCE—RAILROAD COMPANIES—DUTY OF CONDUCTOR.
   The highest duty of the conductor of a railroad train is to supervise its management with all reasonable skill, so that those whose lives are dependent on his care shall be protected from any peril of collision with another train, and it is gross negligence to omit that supervision to do other work about the train.

2. SAME—CONTRIBUTORY NEGLIGENCE OF FELLOW SERVANT—CASE IN JUDGMENT.
   A train being upon a steep grade, and closely followed by another, the conductor employed himself about cutting out one of the cars, throwing the switches to side-track it, etc., neglecting the duty of seeing that the cars detached were held in place; and, a brakeman being asleep, that portion of the train escaped down the grade, killing, by collision, another brakeman on the second train. *Held*, that the company was liable for the want of careful supervision by the conductor, and that the negligence of the sleeping brakeman was immaterial.

3. SAME—CONTRIBUTORY NEGLIGENCE—INJURED BRAKEMAN OUT OF PLACE.

The fact that the deceased brakeman was known as the "middle brakeman," and generally assigned to work on the middle of the train, does not fairly imply that he was guilty of contributory negligence in being found on another part of the train at the moment of the collision; particularly not when the circumstances show that he might properly have been there a few minutes before the collision, while the engine was taking water at a tank.

4. SAME—DIRECTING A VERDICT.

Where one defense is that the deceased contributed to the loss of his life by his own negligence, if the facts proved be such that the court would not sustain a verdict imputing negligence to him, it is proper to withdraw that subject from the consideration of the jury, by directing a verdict on that issue for the plaintiff.

5. SAME—STATUTORY DAMAGES FOR LOSS OF LIFE.

The statute does not give to the surviving dependents a solace for the sufferings of either themselves or the deceased, nor does it proceed upon any sentiment of indignation or punishment for the negligence, but allows compensation for pecuniary loss, and nothing else.

6. TRIAL EVIDENCE—POSITIVE AND NEGATIVE.

Positive testimony to the existence of a fact will prevail over the mere denial of another witness, who has no peculiar knowledge of it, but it is always for the jury to determine whether the denial is as well founded as the assertion.

Motion for New Trial.

There was a verdict for the plaintiff for $4,000. The facts are stated sufficiently in the opinion of the court. The case was tried before WELKER and HAMMOND, JJ., and the defendant moved for a new trial upon exceptions to the charge, and because the verdict was contrary to the law and the evidence, etc. The following is the charge of the court:

HAMMOND, J., (*charging jury.*) The plaintiff sues for the negligent killing of her intestate by the defendant. The negligence is denied. The burden of proof is on the plaintiff, and she must have satisfied you by all the evidence in this case that the negligence averred in her petition has been proved, or she cannot recover.

It is conceded by the plaintiff that she cannot recover if you find from the proof that her husband was killed solely by the negligence of the brakeman, Miles Sweeney; if for no other reason, because that negligence has not been charged in the petition. If, therefore, you find that he only was to blame, your verdict should be for the defendant.

But if you find that the death was caused partly by the negligence of that brakeman, and partly by the negligence of the conductor, Dan Sweeney, or wholly by the latter, your verdict should be for the plaintiff; for the company cannot defend itself against the negligence of the conductor by showing that the brakeman was also negligent. The mere contributory negligence of a fellow-servant is no defense. The master or employer must be wholly without fault on his part, and if he, by his own negligence, causes the injury, the fact that some one else was likewise at fault cannot avail him, although that some one else bore the relation of fellow-servant to the injured party. Here the conductor represented the employer, and it was the company's negligence, if he was negligent.

It is therefore your duty to scrutinize with care the conduct of the conductor, say whether or not he failed to do anything that a reasonably prudent, careful, and skillful conductor would ordinarily have done under the circumstances of the situation, and the doing of which would have prevented this accident; or whether he did anything that a reasonably prudent, careful, and skillful conductor should not have done, which caused the accident.

Was he cautious, prudent, careful, and skillful in the discharge of his duty to those who were behind him on the approaching train?

You are not to impute negligence to him merely because an accident happened by which Christopher Au lost his life. Negligence must always be proved, and is never presumed. The fact that the accident did take place undoubtedly shows that some one was negligent, and grossly so. But it does not necessarily follow that the conductor was to blame, in whole or in part, and it is for you to look to the proof, and say whether any neglect of duty on his part caused the disaster. It may have been exclusively the fault of the brakeman, and was so if you find that the conductor did his whole duty in the premises; for either one or the other, or both, of them are to blame, as there is no proof to place it elsewhere. What, then, did his duty as a conductor require him to do in the circumstances by which he was surrounded? That is the question for you alone to answer. You do not answer it wholly by his opinion, or that of other witnesses, as to what was proper to be done. You do not answer it wholly by the practice or custom of this conductor, or other conductors, on this road, in the same situation. You do not answer it wholly by the rules and regulations of this company, if any there be, applying to it, whether they be those formally prescribed, or those permitted or imposed by the mode of doing business in this company or on this road. All those are important and substantial facts, which you should consider in making up your verdict, and they go to the question of the duty of the conductor in this matter. But, after all that may be said in that direction, the fact remains that the law imposed on this company, and on this conductor as its representative, certain duties in protecting the life of Christopher Au, and all its other employes on the train following that under his charge. It required him to do everything that a reasonable, prudent, careful, cautious, intelligent, and skillful conductor should do while cutting out a car upon a steep grade, under the particular facts of this case, as you have them in proof, to prevent the train from running back into collision with that immediately following it. His judgment in the particular situation; his practice or custom in like or similar situations; the practice or custom of other conductors in like or similar situations; the rules and regulations, either formally prescribed, permitted, or imposed by any means whatever, of doing the business of the road,— are all alike required to conform to this rule of the law prescribing reasonable, careful, cautious, and skillful handling of this train, in all its movements, by the conductor, as its responsible commander.

As men of affairs, acquainted with business, familiar with the duties and responsibilities of human action in ordinary situations, and competent to decide what was reasonable, what was prudent, what was cautious, what was intelligent, what was skillful, and what he was required to do under the particular circumstances, our constitution and laws wisely impose on you, and you alone, the function of determining from the proof before you whether this rule of law that a conductor should act with reasonable care, skill, and prudence was complied with in this case; or, in other words, whether this conductor was negligent, or faithful to his trust.

I am not going over this proof with you, to make any suggestions about it one way or the other. It lies within a very narrow compass, and there is no difficulty about it. I sedulously avoid, when I can do so, speaking of the proof in detail, lest I should unwittingly mislead a jury, or unduly influence it, by giving more or less importance to particular circumstances. I submit it to you as it is in the light of the arguments that have been addressed to you, and call on you to say, impartially, without prejudice, without sympathy for parties, and intelligently, whether or not this conductor was at fault, or at all negligent, under the rule laid down for your guidance. If he was, the company is liable. If he was not, it cannot be, however great the misfortune, or serious the injury, to the plaintiff. It is immaterial that the

brakeman was negligent. The whole question is whether the conductor was negligent. I think I have said all I need say to you on that subject.

We will now consider the alleged contributory negligence of the decedent. As to that, I have not the least hesitancy in saying that the court would not be satisfied with any verdict that imputed negligence to him in any sense whatever, and on that issue you are directed to find for the plaintiff. The whole defense and argument in support of it is based upon an unreasonable inference or implication, based on the words "middle brakeman." The proof shows that on some trains they have two brakemen, called "head brakemen" and "rear brakemen," and on some a third, called "middle brakemen;" but there is not a word to show that there is any special significance in those designations, except a general location of the men on the train. We can see from the nature of the service, with two or three men to do the work of immense trains like these, and abundantly from the proof in this case, that, necessarily, notwithstanding those designations, and this general location, they are not confined to any particular spot on the train, and that, necessarily, they must go wherever they may be ordered, or the exigencies of the service may require, and sometimes wherever their pleasure or whim may call them. It is preposterous, under such a service, to say that it is negligence to be found in any particular place where a brakeman may be ever required to be. Particularly so here, where it is in proof that it was his duty to cut out at the next station, at no great distance away, the very car on which his dead body was found, and that the engineer had been already complaining of lost time; and where it is shown that he might go to the engine or caboose to warm himself, if he chose to do so. But I hold, without the least doubt on the subject, that on the proof in this case as to this particular brakeman, in this particular service, and on this particular train, there is no evidence to be submitted to you from which you could reasonably imply or infer that the decedent was negligent in being at the place he was found killed, and that he thereby contributed to his death. That subject is therefore withdrawn from your consideration.

The only question in the case is whether the conductor was negligent or not. That has been submitted to you, and it is a grave, and, to these parties, most important, question, that demands at your hands your most intelligent judgment.

If you find for the plaintiff, the question will arise as to the measure of damages. At common law there was no cause of action for negligently killing any one, and no damage arose to anybody interested in his life. Precisely why this should be so has never been satisfactorily explained, and modern legislation has changed the law. Now, under the Ohio statute, the widow or next of kin may recover damages for the loss sustained by them. But it is important to remember that this is not a solace given for affliction and wounded feelings of affection; not at all. It is a cold, unsympathetic, and unimpassioned matter of dollars and cents,—compensation for the loss of the decedent's services as a bread and meat winner, so to speak. It is for the pecuniary loss of this wife and son that you are to compensate them, and nothing else. The idea of punishment or of indignation for the wrong done, or of compensating them for their suffering, or for his suffering, in body or mind, does not enter into the calculation in the least. They are entitled to recover, if you find them entitled to a verdict, whatever will fairly and reasonably compensate them for the loss of a husband and father upon whom they depended for sustenance and support. In one sense, we all know that millions of dollars would not compensate either of them, particularly the loving wife who loses her husband, but the law proceeds on no such sentiment as that. It looks at the man as to his age, his physical condition, his capacity as a man of business, his kind of business, his earning power, and all that; and then at the dependents who sue, and their relation to him, and

their interest in his earnings, his future, and his life, as a source of revenue or pecuniary benefits derived from him,—and seeks to measure the damages by that standard, and none other. It cannot, in the nature of the case, be a matter of precise calculation. The law has no delicate scales to weigh the loss or damage. It depends upon the fairness, the good sense, the honesty, and the justice of the jury to fix it impartially, without prejudice, and intelligently, so that on the one hand there shall be no excessive adjustment, nor on the other any undervaluation, but only adequate compensation, under all the circumstances.

Take the case, gentlemen of the jury, and consider your verdict.

*Mr. Russell*, (of counsel for defendant.) I except to the charge of the court, as given, relating to the question of contributory negligence, and withdrawing that issue from the consideration of the jury, under the proof.

*The Court.* Very well.

*Mr. Russell.* I ask the court to charge the jury in these words: "If you find from the evidence that Christopher Au was killed while breaking a rule of the company, the plaintiff cannot recover, if you find that such breach of the rule was the proximate cause of his injury."

*The Court.* I decline to give that.

Exception.

*Mr. Russell.* I ask the court to charge the jury as to one matter that I think was omitted, and that is as to the relative force of negative and positive testimony on a disputed fact.

*The Court.* I have instructed this jury before quite fully as to the rules of evidence that govern them in the determination of all questions of disputed evidence.

There is a rule of law, gentlemen of the jury, that where there is a conflict of testimony, and one testifies positively to a thing within his peculiar knowledge or information, and the testimony of the other is a mere denial of that which is not within his peculiar knowledge or information, the positive testimony will generally prevail over the negative testimony. But it is always a question for the jury to determine whether the witness who testifies about a given fact, although it may be in denial of it, had the opportunity of knowing, seeing, and hearing as well as the other witness had. That is a plain rule of common sense and ordinary judgment of all men in determining such matters, which is to guide you in this case.

Take the case, and consider your verdict.

*Skiles & Skiles* and *M. R. Dickey,* for plaintiff.
*Russell & Adams,* (*Wm. L. Rice* with them,) for defendant.

HAMMOND, J. I have read and reread the voluminous testimony in this case, taken so accurately by the stenographers, with a mind free from the exciting influences of the trial, and the result is that I am more than before satisfied with the verdict. Let us relate briefly the facts, precisely as the defendant company would have us to find them, laying aside, of course, any mere theoretical inferences or conclusions that may be urged in its behalf, through a predetermination to force a conclusion that will permit it to escape all liability, and leaving for separate treatment the defense of contributory negligence. So, favorably stated, the facts are that a freight train, ascending a heavy grade, which rises for the distance of a mile and one-half, was closely followed by another train of the same kind. The first train was manned with two brakemen and a conductor, and had orders,

known to all, to cut out the fifth car, and leave it at the next station. As the train approached that station, still on the up grade, the conductor and his rear brakeman from the caboose observed, as the others had done, that there was a signal requiring him to go to the telegraph office for orders. The conductor told the brakeman that he would go forward to cut out the car, and get the orders. He did go forward, leaving the brakeman at his proper place on the first platform of the caboose. The train was stopped, and the brake on the caboose applied to hold it. The conductor and his engineer then went to the telegraph operator, received their orders, and returned to the train. The signal was given to loose the brakes, which was done, the train pulled up, and stopped until the conductor, who stood at the coupling, could "get the slack," and release it. The five front cars were then pulled ahead, the conductor swinging behind the fifth until it had passed the switches, which he opened, and cut out that car, placing it on the side track. He then readjusted the switches, and returned the train to the main track, to be recoupled to the cars that had been left. But these, 12 in number, while the cutting out was going on, had receded down the grade, and, gathering momentum, crushed into the rear train at the foot of the grade, more than a mile away. The plaintiff's intestate and a companion brakeman upon the rear train were killed. The rear brakeman on the front train forgot that a car was to be left at the station, and supposing, when he loosed the brakes at the signal from the engine, that his train had pulled out upon his trip, retired to the caboose, lay down, and went to sleep, so soundly that he was awakened only by the collision. The conductor gave no signal to the rear brakeman to put on the brakes to hold the 12 cars to be left upon the grade. He did not wait to see whether they would remain stationary until his return, but went forward with the engine and the other brakeman to do the work already described. Neither did the rear brakeman receive any signal from the engine, or elsewhere, to put on the brakes to hold the 12 cars.

Surely, no more advantageous finding of the facts than this could be claimed by the company; and it contains, I believe, every essential circumstance in its favor that is even possible to be interposed as a defense against negligence on the part of the conductor, the negligence of the brakeman being conceded; and yet, if there were a special finding of these facts, I should unhesitatingly direct a judgment for the plaintiff, on the ground of the grossest negligence on the part of the conductor, or else, behind him, upon the company itself, for so inadequately manning its train as to impose duties upon the conductor which, if not necessarily, certainly had a tendency to distract his attention from the higher duty that belonged to him, namely, the protection of the lives of those upon the other train from such a calamity as came upon them. The company owed no more important duty to its men upon the rear train than full protection against

such tragic results as were occasioned in this case by the escape of the greater part of this train from its "commander," as he is shown to be in the case of *Chicago, etc., R. Co.* v. *Ross,* 112 U. S. 377; S. C. 5 Sup. Ct. Rep. 184.

It is idle to undertake by conveniently adjusted distribution of duties, as between brakeman and conductor, to transfer that care of the train which was necessary to prevent this disaster, from the conductor, who was the representative of the company, to the brakeman, who was only a fellow-servant. The most important and primary duty of a conductor is to look to the safe-handling of his train, so that no mistake fatal to the lives of others dependent on his care and skill shall take place. · It takes all precedence of the work of coupling and uncoupling cars, following those cut out to open and close switches, etc.

If, for the sake of economy, his company imposes these latter duties on him, it must answer if the more important be neglected, or transferred thereby to others who neglect it. In our view, it is the conductor's duty reasonably to supervise the brakeman and other trainhands in their work, and that if he neglects such supervision, *that* neglect is the proximate cause of whatever injury occurs, and not the carelessness of the brakeman. We do not say that he is responsible, or the company for him, for every dereliction of duty by those under him, for this may happen with all his care, and after the closest attention from him; but we do say that, under the circumstances of this case, his duty was to know that those 12 cars were so blocked upon the height of that grade that they would not descend it while he was gone away to do the work of switchman and coupler, in cutting out the car. He could not, reasonably, leave the lives of those behind him at the peril of a collision, because the rear brakeman already knew that a car was to be set out, and knew that it would be his own duty to set a brake to hold those to be left unattached. He should have stood by the unattached cars until the brakeman had performed that duty, or, at least, he should have known that he was in his place at that moment, and understood from his signals that it was the time to set the brakes. He should not have relied solely on the expectation that the brakeman would know when to replace the brakes at the proper moment, without a further signal. Indeed, I do not see how the brakeman, 12 cars back, could know, without a signal from some one, just when the uncoupling required him to replace the brakes. The backward motion of the cars might inform him, but prudence would require that he should have information before and outside of that, and it would be negligence to rely alone on such a movement, upon a grade like that described by this proof; particularly when it was known that there was another train following closely, and then about due at that spot; for the rear train had somewhat lost time, as its hands explain, by being too closely held with brakes on the grade just behind that on which this disaster took place. The

situation and circumstances of the moment forbade any uncertainty about those 12 cars being held to their place, and held promptly. If the brakeman himself tells the truth, he had time while the work of uncoupling was going on to get up from a recumbent position in the caboose, to answer the signal to loose the brakes which held the train at a stand-still, return to his resting place beside the stove, and fall soundly asleep, before the backward movement began. The conductor relied, according to his story, upon the fact that he left the brakeman on the platform, telling him what he was going to do about cutting out the car, and that he knew how to keep the detached cars from going back, and at the proper moment would set the brakes. But he left him while the train was approaching the station, and the brakeman says he did not hear him say anything about cutting out the car, and, although he knew that at some time and distance back they had received orders to leave the car, he had forgotten that fact.

Now, these circumstances show how careless it was on that grade to cut loose those cars, upon such a reliance as that, without any attention by the conductor to the rear part of the train. The truth is, I have no doubt, he forgot all about the danger to that train behind. The grade was not in his mind, which was absorbed in other purposes than that of looking to the security of those following him, by giving his careful attention to the 12 cars cut loose. Negligently, he gave too entirely his labor to the matter of cutting out the cars, and doing work that should have been done by others, or left undone until he had given his intelligent supervision to the more important matter of preventing the loose cars going down the hill. A skillful conductor would have had this danger in mind, and given his best attention to the more important duty devolved upon him. It is settled "that, if the occupation or employment be one requiring skill, the failure to exert that needful skill, either because it is not possessed, or from inattention, is gross negligence." *New World* v. *King*, 16 How. 469, 475.

This is the case against the company on the most favorable statement of the facts. But if the jury had found that there was a good deal of nepotism about this affair; that the brother who was conductor fraternally permitted the brother who was brakeman, overworked, tired from loss of sleep, wet, and cold, to sleep beside the stove while he did the work of setting out the car, forgetting the grade, and the danger to those behind, I should not complain at their verdict, notwithstanding the positive swearing of these inculpated brothers to the contrary. Not because of their humble station, nor of their being witnesses for the company employing them, or the like, should they be discredited, if at all; but, as I said in a recent decision, where the station and pretensions of the witnesses were of the highest, I have long since ceased to believe a statement of fact simply because one intensely interested in its being true shall swear to it. We should have as much confidence in human testimony,

sworn or unsworn, as one can have who believes in the common honesty of men; but, as a trier of facts, we should scrutinize the oaths of all men who are interested to establish their property rights, or their characters, or to excuse themselves from blame for the loss of human life, and we should not, because the common-law doctrine of exclusion of such testimony has been abrogated, rush to the other extreme, and credulously accept every statement that is made by interested witnesses, upon the solemn sanction of an oath, in the trial of a cause. These two brothers made a favorable impression on the court, as no doubt they did upon the jury; but, after all, and analyzing their testimony in the closest way, the story that they tell is not corroborated by a single fact—I say nothing of opinions—established by other testimony than their own. It is not at all an *impossible* story that they tell, but it is not as probable, in its relation to the well-established facts, as is the inference that the brakeman was asleep when the train reached Ashland, and was permitted by the conductor to sleep on, in a kindly effort to get along without him.

How came the brother who was conductor to exclaim, "My God! my brother Miles is asleep in that caboose, and will be killed," immediately upon recognizing the awful fact that the cars had gone down the grade? How did he know that he was asleep, if he had not left him so? We are asked to believe that this was a rational inference from the fact that the cars had gone, but this is not wholly satisfactory. The proof shows that everything was done in a hurry, and that the stopping, going in for orders, return to the train, moving up and cutting out, was all done in a very few minutes; and if the conductor left the brakeman at his brakes, and he was there to free them when the train pulled up to loosen the coupling, why did not that situation suggest to the conductor, when he learned the train had receded, the inference that the brake had broken, or that some other such accident had occurred? Why did the notion of his being asleep in the caboose occur at all? It might have suggested that he had been hurt, or for some reason like that was not at his post, but the idea of being asleep *in the caboose* was not a necessary suggestion from the circumstances as they are now related. It was not the language of apprehension that he used, but the statement of a fact.

Again, the brakeman relates most graphically that he *dreamed* of an explosion of a gun, and when he awoke, amid the wreck, the idea occurred to him that his brother *was in the caboose with him*, and that he heard his cries for help. He actually extricated himself, followed the call, hunted amid the *debris*, and, after some time, found the fireman of the rear train, from whom the cries proceeded, and, yet thinking it to be his brother, set to work to help him; and all this time it never occurred to him that his brother had gone from the caboose to cut a car out, nor was there any suggestion to him of the actual facts as they must have been known to him if he were awake at Ashland, as he now says he was, only a very few minutes before the cars

started back. It was a time of confusion of ideas, no doubt, but it is significant that there was in his mind, all during this hunt for his brother, the notion that he was with him *in the caboose*, and never any trace of a remembrance of the actual occurrences of which he now says he was an active participant at the station. If he went to sleep while his brother was in fact in the caboose, his actions, and the thoughts accompanying them, were natural enough; but they were somewhat inconsistent with the facts as they existed in his mind, if he fell asleep at Ashland, after manipulating the brakes, as he says he did, at the very moment when his brother was away, and the retrograde movement must have commenced. Indeed, he had scarcely time to descend from the platform into the caboose, lay down, and go to sleep, from the moment he turned off the brakes until the cars started back, if the speed with which the train was jerked forward and back, "to get the slack," is correctly described by the witnesses.

There are other circumstances tending to support the inference that he was asleep some time before he confesses that he was, but it is not necessary to refer to them here, as, in any view of the facts, the negligence of the conductor is established. One circumstance only is against this inference, if it can be said to be proved by the testimony. The head brakeman says he set no brake to hold the train on its arrival at the station, and the engineer and others give the *opinion* that the train would not have stood on that grade without a brake, and could not have been started "to get the slack" for uncoupling unless the brake holding it had been unloosed. This corroborates, if the opinion be well founded that the engine would not have held the train without a brake, the testimony of the brakeman that he was awake, and set the brake on the caboose, and subsequently unloosed it, on the signal to do so. If that opinion be erroneous, however, or the brake had been set by his brother, the conductor, before leaving the train, as it might have been, if he wished to let him sleep, there is no other circumstance to corroborate them. I have closely examined this proof, with all charity of judgment, and it is my own belief that while perhaps it is not impossible, it is quite improbable, that this accident could have happened, as we know it did, if the brakeman had been on duty at the brakes, as he says he was, almost at the very moment when the cars commenced to go back; for he had scarcely time to re-enter, and fall asleep in the caboose as soundly as he did sleep. But all the peculiarities of the accident are consistently harmonized with the inference that this brakeman was asleep all the time, and that his brother, the conductor, permitted him to rest, while he undertook to get along without him.

Having thus disposed of the question whether the fault was that of the conductor, for which the company is liable, or only that of the brakeman, for which plaintiff concedes it would not be, we come to the other defense of contributory negligence. Were it not for the

evidently sincere opinions of very able counsel, the court would think that defense frivolous. The second train had three brakemen,—head, middle, and rear brakemen,—and they were assigned to portions of the train indicated by those designations. The contention is that, as Au was killed on the car next the tender of the engine, he was negligently out of place, and that he would not have been killed if he had been in the "middle" of the train. Possibly this is so; and he would not, possibly, have been killed if, like the engineer, he had crouched behind the boiler-head, or, like the fireman, had risked a jump to the ground, notwithstanding the difficulties to which he called attention when he said, "We cannot jump here."

This kind of *ex post facto* knowledge which we now have, that in certain places on the train he would have escaped, cannot aid us in determining a question like this. The real inquiry is, was he negligent in being in the particular spot where death came to him? The train had been at the water-tank, had moved but slightly, and was barely under way, when Au, the other brakeman who was killed, the engineer, and the fireman, who were all in the cab of the engine, saw the red lights of the runaway train, which at first they did not comprehend. When the engineer realized the danger, he told them to save themselves, and all attempted to jump; but, the engine being on a bridge across the creek or branch, only the fireman attempted that mode of escape. The engineer crouched behind the boiler, and the two brakemen, evidently trying to escape down the train, were caught and killed at the place before stated. Now, the train-hands examined as witnesses, dominated no doubt by the belief that if the "middle" brakeman had been "about the middle" of the train he would not have been killed, and, pressed hard by counsel to support that capricious theory, gave it as their "expert" opinion that Au ought to have been "about the middle" of the train, because he was "middle brakeman." But it needs no "expert" to know, as we all do, that in the very nature of the work to be done by brakemen, such a confinement of them to particular places on the train is only a convenience for this occasion, and altogether delusive.

When counsel was asked how many feet and inches from the exact middle of the train, either to the front or rear, he would draw the dead-lines beyond which it was contributory negligence to be found, and to tell us where the same fateful lines would come for the "head" and "rear" brakemen, and how it would be when there were only two, as on the first of these colliding trains; and how, where there were more than three,—there was and could be no satisfactory answer; and yet, common humanity would require that these lines should be defined with great precision, if they are to be drawn at all. How do we know that Au was not ordered by his conductor to go where he was, for some purpose unknown, or that some sudden emergency did not make it his duty to go there? We are asked to base an inference that he was out of place upon the bare fact that he was "mid-

dle." brakeman, and was not at the "middle" of the train; for no witness testifies that the middle brakeman could not be required to work elsewhere, if commanded to do so, or that he is not frequently required to work all over the train; and there is proof that he would have been required to do the work necessary to set out that very car on which he was killed when he should get to the next station, and that he knew that that car was not about the middle of the train. Moreover, not one of these witnesses but agrees, on cross-examination, that he might properly go to the engine to warm when the train was stopped, as it was, at the tank. True, it had resumed its motion, but only barely so, when he was killed, and it may be he was on his way "to the post of duty"—as counsel calls it—when he was killed. The witnesses say that, generally, the middle brakeman would go to the caboose to warm, but nothing forbade him to go to the engine, if he chose, as the head brakeman generally did. The caboose was a nicer place, and would be preferred, they say, but circumstances, or a whim, may have led him to the engine on this cold night. I did not submit such proof to the jury, because, on a motion for a new trial, I would not have sustained a verdict charging him with contributory negligence, and this was clearly right, upon authority. *Randall* v. *Baltimore & O. R. R.*, 109 U. S. 478, 482; S. C. 3 Sup. Ct. Rep. 322; *Metropolitan R. R. Co.* v. *Jackson*, 3 App. Cas. 193; *Marshall* v. *Hubbard*, 117 U. S. 415; S. C. 6 Sup. Ct. Rep. 806; *Anderson Co.* v. *Beal*, 113 U. S. 227, 241; S. C. 5 Sup. Ct. Rep. 433.

The case bears no resemblance to that of *Railroad Co.* v. *Jones*, 95 U. S. 439. The duties of a brakeman may call him to be even upon the pilot, or he might be ordered there, as he might be anywhere upon the train. Therefore no contributory negligence should properly be inferred against him upon the bare fact that he is found dead in any particular spot, away from that part of the train where he generally works, in any division of labor between the brakemen on a train.

New trial refused.